PEOPLE v ROCHA

Docket No. 47419. Submitted June 15, 1981, at Detroit.—Decided
    October 6, 1981. Leave to appeal applied for.

    Richard Rocha was convicted of pandering and conspiracy to
    commit pandering following a jury trial in Wayne Circuit
    Court, Roman S. Gribbs, J. Defendant appeals, alleging eviden-
    tiary, instructional and constitutional errors. *Held:*

        1. While evidence of a polygraph examination is inadmissible
    in a criminal trial even where the results of such examination
    are not disclosed, not every reference to a polygraph examina-
    tion constitutes reversible error. Although the initial reference
    to the fact that one of the prosecution's witnesses agreed to
    take a polygraph examination was elicited by defense counsel
    and there was no evidence that such witness actually took a
    polygraph examination, reversal is mandated by reason of the

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 13] 5 Am Jur 2d, Appeal and Error § 881.
    29 Am Jur 2d, Evidence § 831.
    Physiological or psychological truth and deception tests. 23 ALR2d
        1306.
[2] 29 Am Jur 2d, Evidence §§ 296, 831, 1080.
    75 Am Jur 2d, Trial § 266.
    Propriety and prejudicial effect of comment or evidence as to
        accused's willingness to take lie detector test. 95 ALR2d 819.
[3] 4 Am Jur 2d, Appeal and Error § 166.
[4] 68 Am Jur 2d, Searches and Seizures § 35.
[5] 68 Am Jur 2d, Searches and Seizures §§ 35, 36.
[6] 68 Am Jur 2d, Searches and Seizures §§ 57, 106.
    Lawfulness of "inventory search" of motor vehicle impounded by
        police. 48 ALR3d 537.
[7, 8] 29 Am Jur 2d, Evidence §§ 785-788.
    Authentication or verification of photograph as basis for introduc-
        tion in evidence. 9 ALR2d 899.
[8] 63 Am Jur 2d, Prostitution § 14.
[9] 63 Am Jur 2d, Prostitution § 5.
[10] [No reference]
[11] 63 Am Jur 2d, Prostitution § 1.
[12] 16 Am Jur 2d, Conspiracy § 13.
[13] 29 Am Jur 2d, Evidence §§ 296, 831.

fact that the prosecution made repeated references to that evidence and thereby sought to bolster the credibility of that witness by reference to the willingness of the witness to take a polygraph examination.

2. Since the police were justified in stopping the automobile in which the defendant was riding to effectuate his arrest and were justified in impounding the automobile for the purpose of securing the same so that fingerprint evidence could be sought, the police were justified in making an inventory search after the impoundment. The evidence found in that search was properly admitted at trial.

3. The trial court did not abuse its discretion by admitting into evidence the photographic albums used by defendant to induce the complainants even though the pictures in those albums might elicit juror passion or prejudice, since it cannot be said that the trial court erred in determining that the probative value of such evidence outweighed its possible prejudice.

4. The crime of pandering is established even where the actor fails to persuade the victim to become a prostitute.

5. The pandering instructions contained in Michigan Criminal Jury Instructions are sufficient in that such instructions apprise the jurors of all the essential elements of the offense.

6. Defendant's constitutional challenge to the pandering statute on the basis that it protects only females from pandering is not properly before the Court of Appeals, defendant lacking standing to assert constitutional *jus tertii* relative to that question.

7. There was sufficient evidence to convict defendant of conspiracy to commit pandering.

Reversed and remanded.

V. J. BRENNAN, P.J., found no reversible error flowing from the polygraph examination references. He would hold that since there was no objection or request for curative instruction, reversal is not mandated. He would affirm.

### OPINION OF THE COURT

1. CRIMINAL LAW — EVIDENCE — POLYGRAPH EXAMINATIONS — APPEAL.

Evidence of a polygraph examination, even where the results of such examination are not disclosed, is inadmissible in a criminal trial; however, not every reference to a polygraph examination constitutes reversible error and in determining whether reversal is mandated the Court of Appeals will consider: (1)

whether defendant objected to such evidence and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was used in an attempt to bolster a witness's credibility; and (5) whether the results of the examination, rather than merely the fact that an examination had been conducted, were admitted.

2. CRIMINAL LAW — EVIDENCE — POLYGRAPH EXAMINATIONS.

Reversal is mandated by reason of the admission of evidence that a prosecution witness was willing to take a polygraph examination where the prosecution elicited repeated references to such evidence, the prosecution referred to such evidence in its argument to the jury, and such evidence of the witness's willingness to take such examination was used to bolster the witness's credibility.

3. APPEAL — CRIMINAL LAW — EVIDENCE — SUPPRESSION OF EVIDENCE.

The Court of Appeals will not reverse the ruling of a trial court relative to suppression of evidence unless that ruling is clearly erroneous.

4. SEARCHES AND SEIZURES — REASONABLENESS — CRIMINAL LAW.

Warrantless searches are generally deemed to be unreasonable per se with the state bearing the burden of showing that a particular warrantless search was within an exception to the general rule.

5. SEARCHES AND SEIZURES — SEARCH WARRANTS — CRIMINAL LAW.

A subsequently obtained search warrant may not be used to justify a warrantless search undertaken prior to the securing of the search warrant.

6. SEARCHES AND SEIZURES — INVENTORY SEARCHES — EVIDENCE — CRIMINAL LAW.

Evidence found during the warrantless inventory search of a motor vehicle which has been impounded is admissible into evidence where the impoundment of the vehicle was justified by the reasonable belief of the police that the vehicle might contain fingerprint evidence.

7. CRIMINAL LAW — EVIDENCE — PHOTOGRAPHS.

The admission of photographic evidence is largely a matter addressed to the discretion of the trial court; review of the trial court's discretion is directed to ascertaining whether the admission of the photographs was substantially necessary or instruc-

tive to show material facts or conditions rather than merely calculated to excite passion or prejudice.

8. CRIMINAL LAW — EVIDENCE — PHOTOGRAPHS.

The admission into evidence of photographs used by one engaged in the act of pandering, even though such photographs are of such a nature that there is the possibility of juror passion or prejudice, does not constitute reversible error where the evidence is substantially necessary and instructive on the material issues of the defendant's intent and actions and where the Court of Appeals cannot say that the trial court abused its discretion in determining that the probative value of the photographs outweighed their possible prejudicial effect.

9. CRIMINAL LAW — PANDERING — PROOFS.

The crime of pandering may be established even where the actor fails to persuade the victim to become a prostitute.

10. CRIMINAL LAW — PANDERING — JURY INSTRUCTIONS — CRIMINAL JURY INSTRUCTIONS.

The instructions on the offense of pandering contained in the Michigan Criminal Jury Instructions are sufficient as they apprise the jurors of the essential elements of the offense (MCJI 20:10:01).

11. CRIMINAL LAW — PANDERING — APPEAL — CONSTITUTIONAL JUS TERTII — STATUTES.

A person convicted under the Michigan pandering statute may not raise a claim that such statute is constitutionally invalid because it prohibits only the pandering of a female person, the person so convicted lacking constitutional *jus tertii* to raise the question of any dilution of the rights of male persons who have been induced, persuaded, encouraged, inveigled or enticed to become a prostitute (MCL 750.455; MSA 28.710).

12. CRIMINAL LAW — CONSPIRACY — INTENT.

A conviction for conspiracy requires the establishment of dual intent, the intent to commit the wrongful act and the intent to enter into an agreement to commit that wrongful act.

DISSENT BY V. J. BRENNAN, P.J.

13. CRIMINAL LAW — EVIDENCE — POLYGRAPH EXAMINATIONS.

*References to a possible polygraph examination of a prosecution witness does not mandate reversal where the initial reference to the willingness of the witness to take a polygraph examination was elicited by defense counsel, the subsequent references*

*to such evidence by the prosecution were permitted to stand
unchallenged by defense counsel and neither the fact of the
administration of such test nor the results of such test were
made known to the jury, no manifest injustice having been
shown under such circumstances.*

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Larry L. Roberts,*
Assistant Prosecuting Attorney, for the people.

*Richard B. Ginsberg,* Assistant State Appellate
Defender, for defendant on appeal.

Before: V. J. BRENNAN, P.J., and N. J. KAUFMAN
and E. E. BORRADAILE,* JJ.

N. J. KAUFMAN, J. Defendant Richard Rocha
and codefendant Sergio Sanchez were charged in a
three-count information with conspiracy to commit
pandering, MCL 750.157a; MSA 28.354(1), and the
pandering of June Overmyer and the pandering of
Deborah Miller, MCL 750.455; MSA 28.710. Defendant was convicted by a jury on May 10, 1979, of
the pandering of June Overmyer and of conspiracy. Codefendant Sanchez was found guilty only of
conspiracy. Defendant was subsequently sentenced
to two concurrent prison terms of 13 to 20 years,
and now appeals as of right.

Deborah Miller testified that she admitted Rocha and Sanchez into her Redford Township home
in the early morning hours of January 20, 1979.
June Overmyer was present in the house at the
time but was sleeping. According to Ms. Miller,
Rocha told her that he needed hostesses, waitresses and people for an escort service he was
starting. He indicated that the pay would be $1,-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

500 a week, a new car and house, and $50,000 in a bank account every six months. Miller was allegedly told that she would go with clients for the day and "do whatever they wanted". As Rocha and Sanchez were leaving Sanchez told Ms. Miller, "It's a good offer. I don't know how you could refuse it."

Miller stated that Rocha called twice that day and reiterated the offer. Early the following morning, Rocha and Sanchez again visited Ms. Miller. June Overmyer was present and awake. Rocha showed Miller and Overmyer a number of photo albums containing pictures of women with and without clothes. Rocha made comments about the women, describing one as his "newest girl" and a "good prostitute". Rocha indicated that he would like to photograph Miller and Overmyer and repeated his offer of the previous morning. Although Sanchez left following the meeting, Rocha stayed at Ms. Miller's house until the following morning, when he left with Ms. Overmyer. Overmyer testified that she spent the next day alternately with Rocha and Sanchez and at their insistence had sex with them so that they could see what she knew about the "business". After Sanchez dropped Ms. Overmyer off at Ms. Miller's residence, the two women called the police. Subsequently, a warrant was issued for Rocha's arrest.

On January 26, 1979, Rocha was arrested in Detroit by Sergeant Robert Benedix of the Michigan State Police and Sergeant James Fleming of the Redford Township Police Department. Rocha was driving a black Cadillac with a brown leather interior that fit the description of the car that complainant Overmyer had said she was driven around in. Although Rocha's sister was present, the officers decided to impound the car so that it

could be checked for fingerprint evidence. Sergeant Benedix noticed a conga drum in the back seat and asked Rocha if there were other valuables in the car. When he was told that there was a second drum in the trunk, Benedix took the keys from the ignition and opened the trunk to check. He noticed a grocery bag in the trunk that contained books or photographic albums and a brief case. Benedix's observations later served as the basis for a warrant to search the automobile. When the trunk was searched officers recovered the photo albums that Rocha and Sanchez had shown the complainants.

Defendant raises numerous issues on appeal, one of which we find requires reversal of his convictions. When June Overmyer talked with the police she apparently erroneously described Rocha as being 6'5" tall. At trial, she denied making the statement, so counsel for codefendant Sanchez questioned Redford Township police sergeant Oliver Gallagher about the matter. Gallagher read from his report, which indicated that Ms. Overmyer had indeed so described Rocha's height. The prosecutor objected on the basis that the report was not in evidence. Counsel for Sanchez then offered the report and it was admitted and read into the record without objection. The report included the following language:

"Officer explained to her the procedures on a criminal sexual conduct case and asked if she would be willing to take a polygraph test, that she did not have to do so. She said she would be willing to take the test if it were necessary."

Questioning by both defense counsel elicited references to Gallagher's discussion with Overmyer concerning a possible polygraph exam. The subject

was again brought up in the prosecutor's rebuttal argument:

"I'll specifically read that paragraph, ladies and gentlemen. 'Officer explained to her the procedure on the criminal sexual conduct case and asked if she would be willing to take a polygraph test that she did not have to do so. She said she would be willing to take the test if it were necessary.'

"A frame? Again, I ask you ladies and gentlemen, who do you believe here?"

It has long been the rule in this jurisdiction that the results of lie-detector tests are not admissible at trial. *People v Barbara,* 400 Mich 352; 255 NW2d 171 (1977), *People v Davis,* 343 Mich 348, 370; 72 NW2d 269 (1955), *People v Becker,* 300 Mich 562, 566; 2 NW2d 503 (1942). Moreover, reversible error may occur even when the actual results of a polygraph examination are not admitted. *People v Frechette,* 380 Mich 64; 155 NW2d 830 (1968). In *Frechette,* a prosecution witness testified extensively regarding the fact that the defendant had taken a polygraph test. He indicated that he had an opinion as to whether the defendant had responded truthfully during the examination, but he was prevented from stating that opinion. The Supreme Court reversed the defendant's conviction since the jury could have inferred from the testimony that the polygraph examiner believed the defendant to have been lying.

Nonetheless, reference to polygraph examinations need not always constitute reversible error. A reference may be a matter of defense strategy, the result of a nonresponse answer, or otherwise brief, inadvertent and isolated. See, *e.g., People v*

*Krist,* 93 Mich App 425; 287 NW2d 251 (1979), *People v Ranes,* 63 Mich App 498; 234 NW2d 673 (1975), *People v Ernest Green,* 74 Mich App 351; 253 NW2d 763 (1977). Thus, in prior cases, this Court has analyzed a number of factors to determine whether reversal is mandated. *People v Yatooma,* 85 Mich App 236, 240; 271 NW2d 184 (1978), *People v Whitfield,* 58 Mich App 585; 228 NW2d 475 (1975). This Court should consider: (1) whether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test were admitted rather than merely the fact that a test had been conducted.

In the instant case, application of these factors leads us to the conclusion that defendant must be granted a new trial. It is true that the references were not to test results or even to the fact that a test was given but to complainant Overmyer's willingness to take a test. Moreover, the initial references were not only inadvertent and unobjected to but occurred first during defense examination of a police witness. Still, the references were unnecessarily repeated. The police report in question was read into the record and then brought up again in the prosecutor's rebuttal argument. The prosecutor's purpose in bringing up the polygraph reference was plainly to bolster Ms. Overmyer's testimony with her willingness to take a polygraph examination. Further, the jurors might easily have inferred that the police took up Ms. Overmyer on her offer and that she was given and passed a polygraph test. Moreover, since credibility was a critical issue at trial, we can hardly discount the possible impact of these references

upon the jurors' deliberations. We therefore reverse defendant's conviction.

Because of the possibility of retrial, we consider those other issues raised by defendant which may arise again.

As part of the prosecution's case, the photographic albums shown by Rocha and Sanchez to the complainants were admitted into evidence. Defendant argues that the evidence should have been suppressed as the product of an illegal warrantless search and because the prejudice from admission of the evidence substantially outweighed its probative value. At the culmination of a pretrial suppression hearing, the trial court concluded that the albums were admissible. This Court will not reverse a trial court's ruling at a suppression hearing unless clearly erroneous. *People v Goss,* 89 Mich App 598, 601; 280 NW2d 608 (1979), *People v Terrell,* 77 Mich App 676, 679; 259 NW2d 187 (1977).

Generally, warrantless searches are unreasonable per se and in violation of the Fourth Amendment to the United States Constitution, as well as Const 1963, art 1, § 11. The state bears the burden of showing that a particular warrantless search is within an exception to the rule. *People v Reed,* 393 Mich 342, 362; 224 NW2d 867 (1975). Here, although a search warrant was ultimately obtained, it may not be used to justify the initial search of the car trunk. *People v Gallagher,* 55 Mich App 613, 617; 223 NW2d 92 (1974). Nonetheless, we cannot conclude that the trial court's findings were clearly erroneous since we agree that the officers' actions came within the inventory search exception to the warrant requirement. *South Dakota v Opperman,* 428 US 364; 96 S Ct 3092; 49 L Ed 2d 1000 (1976).

In *Opperman,* the defendant's automobile was
impounded for being parked illegally in a restric-
tive zone. At the impound lot, the police observed
a watch on the vehicle's dashboard and other
items of personal property on the back seat and
floor. The car was unlocked and its contents inven-
toried by an officer using a standard inventory
form. Inside the vehicle's unlocked glove compart-
ment the police found a plastic bag of marijuana.
*Id.,* 365-366. The South Dakota Supreme Court
reversed the defendant's conviction for possession
of the substance, concluding that the search vio-
lated the Fourth Amendment. *Id.*

After granting certiorari, the Supreme Court
reversed, determining that under the facts and
circumstances of the case the search was not
unreasonable. The Court stated that the routine
securing and inventorying of impounded automo-
biles is justified by three needs: (1) the protection
of the owner's property while in police custody; (2)
the protection of the police against claims or dis-
putes over lost or stolen property; and (3) the
protection of the police from potential danger. *Id.,*
369.

Recently, in *People v Long,* 94 Mich App 338;
288 NW2d 629 (1979), this Court relied on *Opper-
man* to justify an on-the-scene search of an auto-
mobile. In *Long,* the defendant was observed
speeding but by the time the officers caught up
with him he had driven his vehicle into a ditch.
The police observed a large knife on the floor of
the vehicle, prompting a further view onto the
front seat with the aid of a flashlight. There an
officer noticed a leather pouch protruding from
under an armrest; the pouch was found to contain
marijuana. Upon arresting the defendant, the offi-
cers determined that the vehicle would have to be

impounded. One of the officers saw that the trunk lock had been punched out, so he unlatched the latch with his penknife. Within the trunk was another 70 to 75 pounds of marijuana. At the preliminary examination, the officer stated that he opened the trunk both to check for valuables and because he suspected that there might have been more marijuana inside. *Id.,* 341-343. On appeal, this Court determined that the officer's search of the trunk was proper despite the fact that it was made at the scene and not at the impoundment lot. The Court noted that the decision to impound was made prior to the search. The fact that the officer decided to look into the trunk for two separate reasons did not compel the conclusion that the search for valuables was a mere pretext for a search for marijuana. *Id.,* 347-349.

The present situation is analogous. We believe that the officers were justified in their initial decision to impound the vehicle. The Cadillac fit the description of one of the automobiles that June Overmyer had told the police she was driven around in. The officers felt that the interior of the vehicle might contain fingerprint evidence of Ms. Overmyer's presence. Although Sergeant Benedix testified at one point that the vehicle was impounded because the owner was not present, he later stated that even if the owner had been there the auto would have been taken for fingerprint evidence.

Once the decision to impound the vehicle had been made, the officers had a right to protect themselves from possible theft charges by inventorying the car. Defendant told Sergeant Benedix that the trunk contained another drum. Thus, Benedix was justified in verifying that the drum was indeed there. The view into the trunk was not

unreasonable under the circumstances, so suppression was not mandated.

Defendant also argues that the albums should have been suppressed because of their prejudicial nature. As noted, the albums contained a variety of pictures of women, some clothed, some naked and provocatively posed. Defense counsel offered to stipulate that the pictures existed and were shown to the complainants.

The admission of photographic evidence is largely a matter of trial court discretion. *People v Eddington,* 387 Mich 551; 198 NW2d 297 (1972), *People v Falkner,* 389 Mich 682; 209 NW2d 193 (1973). The determination upon review is whether the photographs were substantially necessary or instructive to show material facts or conditions, or merely calculated to excite passion and prejudice. *People v Falkner, supra,* 685. The prosecution is not required to exhaust alternate proofs prior to or in lieu of admission. *People v Eddington, supra,* 562.

Here, the photographs were relevant inasmuch as they corroborated the claims of Ms. Miller and Ms. Overmyer that they had been shown the same. Moreover, they served as direct evidence of the defendants' intent in their discussions with the complainants. Again, Rocha commented on the women in the album, describing one as his "newest girl" and a "good prostitute". The photographs indicated what the defendants expected of complainants and that the expectation was effectively communicated to the women. Thus, the pictures were substantially necessary and instructive on a material issue. Certainly, pictures of this nature bring with them the possibility of juror passion or prejudice. However, after reviewing both the pictures and circumstances of this case we cannot say

that the trial court abused its discretion in determining that their probative value outweighed possible prejudice. *Cf. People v Talley,* 410 Mich 378, 386-387; 301 NW2d 809 (1981).

Defendant next argues that the trial court erred in confusing the elements of pandering and attempted pandering. Defendant was convicted of pandering June Overmyer although it is undisputed that Ms. Overmyer did not become a prostitute or engage in acts of prostitution. Defendant contends that, at most, he could only be convicted of attempted pandering and the trial court therefore erred in denying the motions to quash and for a directed verdict and in instructing the jury.

MCL 750.455; MSA 28.710, provides in pertinent part:

"Any person * * * who shall induce, persuade, encourage, inveigle or entice a female person to become a prostitute * * * shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 20 years."

The information charged that defendant "did induce, persuade, encourage, inveigle or entice [June Overmyer], a female person, to become a prostitute". Defendant argues that the statute's use of the words "induce" and "persuade" imply that the act of pandering is not completed unless the victim actually becomes a prostitute. We disagree.

It is well-settled that criminal statutes are to be strictly construed, and that no one may be punished for doing an act unless the act clearly comes within the spirit and letter of the prohibiting act. *People v Goulding,* 275 Mich 353, 359; 266 NW 378 (1936). If the statute in question only prohibited inducing or persuading a woman to become a

prostitute defendant's argument might have merit. However, the section also uses the words "encourage", "inveigle" and "entice". The plain and ordinary meaning of these words in the context of the statute indicates that pandering may be accomplished even though the actor does not successfully persuade his victim to become a prostitute.

Our reasoning is supported by *People v Bradshaw*, 31 Cal App 3d 421; 107 Cal Rptr 256 (1973), a case decided by the California Court of Appeals. In *Bradshaw*, the Court interpreted Cal Penal Code § 266i, which in pertinent part makes criminal the actions of one who "causes, induces, persuades or encourages another person to become a prostitute". The Court concluded that success is not an element of the offense proscribed by the word "encourage". *Id.*, 425. See also *State v Gates*, 118 Utah 182; 221 P2d 878 (1950).

We do not believe that *People v Cook*, 96 Mich 368; 55 NW 980 (1893), requires a contrary result. The *Cook* decision construed a previous incarnation of the statute and concluded that a person could not be found guilty of soliciting a woman who is already a prostitute. Since such a woman cannot "become" a prostitute, any other interpretation effectively would have read that word out of the act. Nonetheless, a woman who is not a prostitute may still be "encouraged", "inveigled" or "enticed" to become a prostitute, though without success.

We also find without merit defendant's argument that the instructions on the offense of pandering,[1] taken from MCJI 20:10:01, were insuffi-

---

[1] "As to Counts II and III, pandering. I will define that crime. Each defendant is charged with inducing, persuading, encouraging, enticing or inveigling a female person to become a prostitute.

"Each defendant pleads not guilty to these charges. To establish these charges, Counts II and III, the prosecution must prove each of the following elements beyond a reasonable doubt:

cient. The language of the instructions was taken directly from the statute in question and acted to apprise the jurors of all the essential elements of the offense. *Cf. People v Liggett,* 378 Mich 706; 148 NW2d 784 (1967). The jurors were required to find that defendant knowingly and intentionally, for the purpose of prostitution, was inducing, persuading, encouraging, enticing or inveigling a female person to become a prostitute. No error is apparent.

Defendant's next appellate claim is that the pandering statute constitutes a denial of equal protection under the Fourteenth Amendment to the United States Constitution and Const 1963, art 1, § 2. The statute prohibits pandering only of "a female person". Similar actions taken against a male victim would at most constitute the misdemeanor of solicitation, MCL 750.448; MSA 28.703. Defendant contends that the statute denies equal protection by providing women with greater protection against such offenses.

Defendant's claim is not properly before this Court. As a general rule, one may not claim standing to vindicate the constitutional rights of some third party. *Barrows v Jackson,* 346 US 249, 255;

"First, that each or both of the defendants did the act or acts complained of.

"Second, that each did so for the purpose of prostitution or both of them did so for the purpose of prostitution.

"Third, that either or both of them did so knowingly and intentionally.

"And fourth, that this occurred on or about the date mentioned in the information, January 20 through January 22, 1979 and in Wayne County, Michigan.

"A prostitute is a person who performs acts of sexual intercourse for money.

"To inveigle means to lead on with deception or to entice. It is charged in this case that Richard Rocha or Sergio Sanchez or both of them either directly commited *[sic]* the crimes charged, pandering and conspiracy to pander, three crimes or that each intentionally aided or assisted another in the commission of that crime."

73 S Ct 1031; 97 L Ed 1586 (1953). Exceptions exist when a party challenges a statute for being overbroad or where *jus tertii* standing is found to exist. See Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court,* 71 Yale L Rev 599 (1962); Note: *Standing to Assert Constitutional Jus Tertii,* 88 Harv L Rev 423 (1974). A *jus tertii* litigant essentially argues that a single application of a statute injures him and impinges on the constitutional rights of third parties. Note, *supra,* 424.

Here, defendant argues not that the statute is overbroad but rather that it is underinclusive. Further, defendant is not properly a *jus tertii* claimant because, although he is injured by application of the statute, that application does impinge on the third parties alleged to be discriminated against. The purported discrimination arises out of the failure of the statute to apply in alternative factual situations.

The cases permitting the assertion of *jus tertii* standing appear most often to depend on the existence of three factors: (1) the presence of some substantial relationship between the claimant and third parties, (2) the impossibility of third parties otherwise asserting their constitutional rights; and (3) the need to avoid dilution of those rights that would result without the granting of *jus tertii* standing. Note, *supra,* 425.

Examples of substantial relationships between a *jus tertii* claimant and third parties are found in the doctor-patient relationship, *Eisenstadt v Baird,* 405 US 438, 443-446; 92 S Ct 1029; 31 L Ed 2d 349 (1972), the relationship between a distributor of contraceptives and contraceptive information and recipients, *Griswold v Connecticut,* 391 US 479, 481; 85 S Ct 1678; 14 L Ed 2d 510 (1965), the

relationship between a private organization and its members, *NAACP v Alabama ex rel Patterson,* 357 US 449, 458-460; 78 S Ct 1163; 2 L Ed 2d 1488 (1958), and that between a real estate vendor and his vendee, *Barrows v Jackson, supra.* In each example there appears to be a pre-existing and substantial relationship. In the present case, there is no relationship between defendant and those third parties (potential male pandering victims) alleged to be discriminated against.

Concededly, it is unlikely that third parties in question can otherwise assert the equal protection claims. However, it is also plain that dilution of their rights will not be avoided by granting defendant *jus tertii* standing. There is no link between defendant's injury and the harm to the third parties, that is, that they are not adequately protected by the criminal laws dealing with prostitution and pandering. Defendant seeks not to extend protection to these individuals but to void the statute as it is applied to him. For these reasons we hold that defendant lacks standing to raise the third party constitutional claims.

Defendant's next argument is that there was insufficient evidence to find him guilty of conspiracy to pander. In reviewing whether evidence is sufficient to support a conviction, we consider the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979), *People v Delongchamps,* 103 Mich App 151, 159; 302 NW2d 626 (1981).

A conspiracy conviction requires the establishment of dual intent, the intent to commit the wrongful act and the intent to enter into an

agreement with another to commit that wrongful act. *People v Atley,* 392 Mich 298, 310; 220 NW2d 465 (1974). A conspiracy may be established by circumstantial evidence. *Id.,* 311.

Here, complainants testified that defendant Rocha offered them employment performing sexual acts. Further, it appeared that Rocha had sexual relations with complainant Overmyer, ostensibly to find out how much she knew. The testimony further revealed that codefendant Sanchez took Rocha to meet the complainants and was present during the discussions. Sanchez also told the complainants that he thought they were being made a good offer, and he otherwise appeared to act at Rocha's direction. Finally, Sanchez also had relations with Ms. Overmyer and told her that she would need a lot of energy in the "business".

We believe that these circumstances indicate that Rocha intended to pander and intended to, and did in fact, enter into an agreement with Sanchez to that end. A rational trier of fact could have found defendant guilty beyond a reasonable doubt of conspiracy to pander.

Defendant's final claim, that the trial court erred in instructing the jury that they could only find both defendants guilty of conspiracy or neither defendant guilty, is without merit. *People v Alexander,* 35 Mich App 281; 192 NW2d 371 (1971).

Reversed and remanded for a new trial.

E. E. BORRADAILE, J., concurred.

V. J. BRENNAN, P.J. *(dissenting).* I would affirm this conviction as I respectfully disagree with my colleagues' application of polygraph test law to the facts of this case so as to conclude there was reversible error.

First and foremost, the initial references to the

complainant's willingness to take a polygraph examination were directly attributable to the defense attorneys. A review of the record reveals that both defense attorneys elicited references to the polygraph examination in their direct examination. It was also defense counsel for codefendant Sanchez that chose, after the prosecutor objected to reference to the report, to have the entire report read into the record as an exhibit. This report, including the now challenged polygraph reference, was read into the record without objection to its admission being raised by defendant Rocha's counsel. Thereafter, defendant Rocha's counsel also examined the officer in such a way as to elicit reference to the polygraph examination. On this record, I can only assume that all of the foregoing was deliberate trial strategy by the defense. Choices made by defense counsel under the rubric of "trial strategy" do not deprive a defendant of a fundamentally fair trial necessitating reversal. *People v Krist,* 93 Mich App 425, 438; 287 NW2d 251 (1979), *lv den* 407 Mich 963 (1980). Counsel is never to be encouraged to sit back, harbor or create error to be used as an appellate parachute in the event of jury failure. *People v Brocato,* 17 Mich App 277, 305; 169 NW2d 483 (1969). In the instant case, defense counsel permitted the reference to come into the record without raising any objection and then elicited through examination further reference to it. Defendant should not be permitted to take advantage of this on appeal.

Second, the challenged testimony was limited to the complainant's "willingness" to take a polygraph examination. There was no testimony either as to whether the complainant took a test or as to the results of any test. *People v Krist, supra,* 438, *People v Whitfield,* 58 Mich App 585; 228 NW2d

475 (1975), *People v Ranes,* 63 Mich App 498; 234 NW2d 673 (1975).

Finally, while not approving of the prosecutor's rebuttal argument, I do not think that, in light of defense counsel's own references to the polygraph and lack of objection to the introduction of the exhibit, this statement rose to the level of being "part of a pattern of contumacious conduct on the part of the prosecutor" so as to "misuse the judicial system to prevent defendant from receiving a fair trial". *People v Alvin Johnson,* 396 Mich 424, 436; 240 NW2d 729 (1976). Moreover, defense counsel for Rocha did not object to the prosecutor's argument nor request a cautionary instruction. *People v Tyrer,* 19 Mich App 48, 50-51; 172 NW2d 53 (1969), *app dis* 385 Mich 484; 189 NW2d 226 (1971), *People v Paul F Baker,* 7 Mich App 471, 476; 152 NW2d 43 (1967), *lv den* 380 Mich 766 (1968). Therefore, I am persuaded that, in light of all the foregoing, no manifest injustice is demonstrated so as to warrant a new trial. I would affirm defendant's conviction.