# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 1, 2015

Plaintiff-Appellee,

v

No. 320065
Wayne Circuit Court
LC No. 13-007077-FC

NASSER MOHAMAD BAZZI,

Defendant-Appellant.

Before: WILDER, P.J., and SHAPIRO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a), two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a), and two counts of fourth-degree criminal sexual conduct (CSC-IV), MCL 750.520e(1)(a). The trial court sentenced defendant to 135 months to 22 years for each CSC-I conviction, 10 to 15 years for each CSC-II conviction, and one to two years for each CSC-IV conviction, all sentences to be served concurrently. We affirm.

I

A

Defendant's convictions arise out of instances of sexual abuse against his niece during her childhood and teenage years. Before the victim married her husband in November 2011, she lived with her mother, Afrah Hamid, and eight siblings in the family home in Dearborn, Michigan. Her father also lived with the family until his death. Various family members testified that defendant was a frequent visitor and often spent the night in available spaces in the family home, including the room shared by the victim and four of her sisters.

The victim testified that defendant started to abuse her when she was 11 years old and described multiple instances of sexual abuse at trial.[1] In the context of explaining her

---

[1] The prosecution witnesses and defense witnesses provided different accounts of the details of the home and plausibility of the victim being alone with defendant at specific times throughout her childhood and teenage years.

-1-

relationship with defendant, the victim explained that, when her father was not present, defendant disciplined the children and even hit them, without objection from her mother. The victim further explained that avoiding disrespect is very important in Lebanese-American culture, and the men in her family are like kings, whereas women are like servants. As a result, she continued to interact with defendant after the abuse began and behaved according to her culture's expectations because, otherwise, she feared that defendant or her mother would "make a problem out of it."

Despite the fact that defendant threatened to kill her if she revealed his abuse, and that talking about molestation was not a "comfortable" subject within her family, the victim testified that she eventually began to reveal the abuse that had occurred. The victim explained that her family repeatedly urged her to maintain her secrecy after she revealed the abuse, reasoning that it could cause embarrassment. The victim further clarified that, if a man knows a woman has been "touched before[,] . . . it's like you're trash . . . like you're not worthy to marry a good man."

Zeina Hamid, the wife of the victim's brother, Ahmad Hamid, recalled overhearing a conversation at her house between the victim's sisters (Latefa and Fatema Hamid) and the victim's friend (Hoda Fawaz) about the molestation.[2] She later directly confronted the victim about the abuse, but, at the urging of Latefa, Fatema and Hoda, did not report the conduct.[3] Zeina testified that the victim's mother and sister, Laila Hamid, subsequently warned her to maintain the secrecy for the sake of the girls' reputations and their abilities to marry. At trial, Laila admitted that she warned Zeina to stay out of her family's business.

When the victim was engaged in August 2011, and began planning her wedding, her mother wanted defendant to sing at the wedding.[4] The victim testified that the victim confronted her mother directly about the abuse in order to explain why she did not want defendant to sing. At trial, the mother testified that the victim never told her that defendant had abused her and only indicated that he abused others. Additionally, the mother stated that the victim's accusations that defendant abused others were merely suspicions, with no personal observations, and constituted a sin in their religion.

---

[2] Zeina testified that the victim's family generally did not like her, and defendant's witnesses offered similar testimony. Latefa explained that her mother accepted Zeina as Ahmad's wife, but "always made us keep a certain distance away from her." Defense counsel elicited testimony from the victim's sister, Mariam Hamid, that their parents did not want Ahmad to marry Zeina.

[3] Latefa, Fatema, and Hoda denied any such conversations.

[4] On direct examination, the victim admitted that her family did not like her husband. Everyone but Ahmad objected to the wedding, but her mother ultimately gave her permission to marry, and the family attended the ceremony. The victim's mother explained that, despite her daughter's choice for a husband, she wanted to be at the wedding to support her. The family purchased wedding gifts for the victim, but the victim never collected them from the family home. The victim also prevented her family from throwing a shower for her and shopping for her wedding dress, and several witnesses testified that she was standoffish at her wedding.

According to the victim, she secretly recorded a subsequent conversation with her mother about defendant's abuse two or three weeks after she first revealed the abuse to her mother because of her mother's lack of support with regard to the allegations and a fear that she would be accused of lying. The recording was primarily in Arabic, and the record demonstrates a dispute among the witnesses and an interpreter regarding the English translation of the conversation. The victim testified that, during that conversation, she again told her mother that defendant abused her and others, but her mother angrily expressed concerns about "how this would look if people found out in the community," stating that the victim should lie about it, even if she had a gun pointed to her head, and take the information to her grave. Likewise, Ahmad confirmed that that his mother and sister "were talking about how [defendant] molested her and pretty much, you know, my mom was telling her to stay quiet, not tell anybody." The prosecutor also elicited testimony that, in the recording, the victim mentioned whom she had previously told about the abuse. In contrast, Latefa claimed that her mother never told the victim to lie, and Laila and the mother testified that they did not hear any reference to the victim or her sisters being abused on the recording. Instead, they testified that the victim had only stated that the defendant had abused "somebody else" or "other people," and that the mother had only told the victim to stop talking about her suspicions, which were not based on anything that the victim witnessed herself.[5]

After the victim's wedding in November 2011, Ahmad noticed that his family was treating the victim and Zeina differently. When he confronted the victim, she revealed defendant's abuse. Ahmad testified that, afterward, he discussed the abuse with their mother, who urged him to keep the secret to preserve his sisters' ability to marry. Ahmad also discussed the abuse with his brothers and his father's brothers, who called a family meeting at one of their homes the next day.

The victim testified that, at the family meeting, (1) she discussed the abuse that she had suffered, (2) Mariam admitted to having heard the victim's allegations once before, and, (3) although they initially denied that defendant had abused them, Fatema and Latefa ultimately revealed that they were victims as well. Ahmad and Zeina, as well as the victim's aunt (Soufa Moukdad) and her uncle (Moustafa Hamid), testified similarly on rebuttal that, at the meeting, the victim, Fatema, and Latefa revealed that defendant had abused them; these witnesses explained that the victim's sisters initially denied the abuse, but admitted it after an uncle suggested a polygraph examination. According to the victim, the meeting ended with the family crying and hugging one another. The victim testified that she did not go to the police afterward because she lacked the necessary confidence and self-esteem; she was also trying to give her sisters time to process their revelations.

Defendant's witnesses testified very differently regarding the family meeting. They maintained that Fatema and Latefa denied any abuse throughout the meeting, despite the suggestion of a polygraph and Ahmad's "very explosive" behavior and tendency to gesture

---

[5] Ali Hamid also testified that he heard the tape, but he did not remember what his mother and sister said on the tape.

toward his waist—where a gun could have been stored in a holster—when the sisters refused to change their stories. Likewise, Fatema and Latefa again testified at trial that defendant never abused them.

The victim testified that, after the meeting, her mother, sisters, and two brothers (Hassan and Ali Hamid) never talked to her again. Although she admitted that her mother attempted to contact her while she was pregnant, the victim did not respond. She suspected that her mother only wanted to save face in the community. Ahmad similarly had little contact with his family after the meeting and explained that he lost respect for his mother, who was most worried about "hiding everything."

In June 2012, the victim recorded her feelings about defendant's conduct in a diary. She testified that she did not specifically describe what occurred during the molestation. In her diary, she also discussed her family's attempts to interfere with her marriage.

Ahmad testified that, in January 2013, which was approximately one year after the family meeting, he could no longer maintain the family's secret. Despite his mother's warnings that his sisters would be blacklisted, he reported the abuse of his sisters by defendant to the police so that he would not "do something crazy" and "go to jail." Afterward, his mother cut off all ties with him. The investigating officer testified that she reached out to Laila, Fatema, Latefa, and Mariam, but only Mariam responded, indicating that she did not want to be involved.

B

At trial, the prosecutor indicated during her opening statement that "there were allegations that came out and there was [sic] some disclosures" at the family meeting. Subsequently, during his opening statement, defense counsel asserted that although the victim claimed to the police that defendant also abused Laila, Fatema, and Latefa, "[n]ever was [defendant] ever confronted with having touched one of those younger sisters." He later asserted that Ahmad used a gun and threatening conduct at the family meeting "to solicit and demand and extract confessions from the girls[, but even] . . . in the face of . . . all those threats[,] all the girls are consistent, nothing ever happened to us, what are you doing and why are we here and why are we going through this?" Subsequently, witnesses offered conflicting testimony regarding whether the victim's sisters were abused by defendant and whether the sisters disclosed that they were abused during the family meeting. During their testimony, the sisters consistently maintained that they were not sexually abused by defendant. The defense did not make a timely objection to the prosecutor's opening statement or to any of the references to defendant's abuse of the other sisters during the prosecution's case-in-chief. During his closing argument, the defense argued that the victim was not credible in making her allegations against defendant because she lied when she claimed that her sisters had made similar allegations.

Additionally, the prosecutor elicited the following testimony from the victim's brother, Ali:

*Q.* Now, you said you would never -- you'd never of thought that your uncle would do something, correct, to your sisters?

*A.* No, I wouldn't of.

-4-

*Q*. And you don't want that to be true, is that correct?

*A*. It's not true.

*Q*. Fair to say you wouldn't want that to be true, correct?

*A*. It's not true.

*Q*. Sir, yes or no, is it fair to say that you wouldn't want that to be true?

*A*. Yes.

*Q*. Okay. And if it were true that would mean that you, as an older brother, failed to protect your younger sisters, isn't that correct?

*A*. It's a hypothetical. I'm not even going to answer it.

*Q*. Would that mean you failed, as an older brother, to protect your younger sisters?

*A*. No, I don't think so.

*Q*. If your uncle who was living in the house was molesting your sisters --

*A*. No.

*Q*. -- you wouldn't feel guilty at all?

*A*. No.

Also during trial, defense counsel attempted to elicit testimony, which the trial court excluded, regarding the details of a variety of matters, including, *inter alia*, the family's dissatisfaction with the victim's husband; the criminal record of the victim's husband; the family's disapproval of Zeina before she married Ahmad; the family's relationship and contact with Zeina and Ahmad after their marriage; the interactions between the victim's mother and Ahmad's and Zeina's child; an instance during which Ahmad allegedly assaulted his mother; defendant's relationship with the victim's father; an instance during which defendant "demanded" that the victim dance with him; whether Ahmad apologized after the family meeting; how Latefa would have responded if she had told her mother that she had been abused and her mother did not believe her; whether the victim changed her phone number after her wedding; and the mother's contact and relationship with the victim before and after the wedding.

Following the parties' closing arguments, the trial court specifically instructed the jury, "If you believe that a witness previously made a statement inconsistent with his or her testimony at this trial[,] the only purpose to which that earlier statement can be considered by you is in deciding whether the witness testified truthfully in court. The earlier statement is not evidence that what the witness said earlier is true."

Following his trial and sentencing hearing, defendant filed a motion for a new trial and request for a *Ginther*[6] hearing, which the trial court denied. Subsequently, defendant filed in this Court a motion to remand for an evidentiary hearing in order to further develop the factual record. On January 23, 2015, this Court denied the motion, stating:

> The Court orders that the motion to remand pursuant to MCR 7.21l(C)(I) is DENIED. Defendant-appellant previously moved for a new trial and requested an evidentiary hearing under MCR 7.208(8) on the same grounds raised in the motion to remand, which the trial court denied. Defendant-appellant has not demonstrated that the trial court should have conducted an evidentiary hearing on the issues raised in his motion for a new trial. The majority of the arguments involve matters that can be reviewed based on the existing trial record. On the remaining issue involving the trial court's ruling limiting cross-examination regarding motive or bias, defendant-appellant has not supported his motion with an affidavit or offer of proof to establish how he would further develop the record on that issue on remand. [*People v Bazzi*, unpublished order of the Court of Appeals, entered January 23, 2015 (Docket No. 320065).]

II

Except as noted below in Part V, all of defendant's claims of evidentiary error and prosecutorial misconduct are unpreserved, as defendant failed to make a timely objection to the evidence that he challenges on appeal and failed to object to the alleged instances of prosecutorial misconduct. MRE 103(a)(1); *People v Metamora Water Serv*, 276 Mich App 376, 382; 741 NW2d 61 (2007). We review unpreserved issues for plain error affecting substantial rights. *People v Vandenberg*, 307 Mich App 57, 61; 859 NW2d 229 (2014), citing *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To demonstrate such an error, the defendant must show that (1) an error occurred, (2) the error was clear or obvious, and (3) "the plain error affected [the defendant's] substantial rights," which "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763.

Additionally, our review of defendant's ineffective assistance of counsel claims is limited to errors apparent from the lower court record because a *Ginther* hearing was not held in the trial court. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007) (citations omitted). "A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008), citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

> Effective assistance of counsel is presumed, and defendant bears a heavy burden of proving otherwise. To demonstrate ineffective assistance, defendant must

---

[6] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

show: (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that this performance so prejudiced him that he was deprived of a fair trial. "To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." [*People v Gaines*, 306 Mich App 289, 300; 856 NW2d 222 (2014) (citations omitted).]

"A defendant must also show that the result that did occur was fundamentally unfair or unreliable." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012).

III

Defendant first argues that the trial court erred by admitting evidence that the victim alleged that he not only abused her, but also her sisters. Defendant contends that this was improper other-acts evidence and inadmissible hearsay. We disagree.

The record discloses that defendant first opened the door for evidence regarding these allegations in his opening statement. See *People v Bates*, 91 Mich App 506, 510; 283 NW2d 785 (1979) (stating, in the context of other-acts evidence, that a defendant may put a matter into "issue by opening argument, cross-examination, or the presentation of affirmative evidence"). He cannot now complain of an error that he precipitated. To hold otherwise would allow defendant to harbor error as an appellate parachute. See *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000); *People v Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001) ("A defendant will not be heard to introduce and use evidence to sustain his theory at trial and then argue on appeal that the evidence was prejudicial and denied him a fair trial"); *People v Green*, 228 Mich App 684, 691; 580 NW2d 444 (1998) ("A defendant should not be allowed to assign error on appeal to something his own counsel deemed proper at trial.").[7] Therefore, defendant's argument is without merit.[8]

---

[7] We reject defendant's claim that the prosecutor first introduced this challenged evidence in her opening statement, as the prosecutor's statement did not include any reference to abuse perpetrated by defendant against the victim's sisters.

[8] We also reject defendant's argument that reversal is required regardless of whether the defense opened the door to the evidence given the mandatory notice requirement under MRE 404(b)(2). Even if a prosecutor plainly errs by failing to provide notice, a defendant still must show that the error affected his substantial rights, i.e., that the error affected the outcome of the trial court proceeding; reversal is only warranted "when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Carines*, 460 Mich at 763 (quotation marks and citations omitted). On the record before us, we conclude that defendant has failed to establish prejudice from the prior-acts evidence, especially given the consistent, in-court statements of the victim's sisters that defendant did not abuse them, and the defense's use of the victim's allegations involving her sisters to undercut the victim's credibility.

Defendant also asserts that defense counsel was ineffective for either failing to object to, or by introducing, the victim's statements regarding the alleged abuse against her sisters. We disagree.

Here, because defense counsel opened the door to the challenged evidence, any objection to the prosecutor's questioning on the same topic would have been futile; thus, defense counsel's failure to object did not constitute ineffective assistance. *People v Unger*, 278 Mich App 210, 256; 749 NW2d 272 (2008). Furthermore, to the extent that defendant suggests that defense counsel was ineffective for introducing the challenged evidence, decisions regarding what evidence to present are generally presumed to be matters of trial strategy. *LeBlanc*, 465 Mich at 578; *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Defense counsel introduced evidence of the victim's allegations that defendant abused her sisters, but then elicited testimony from her sisters that they were never abused. As such, it is apparent that defense counsel used this evidence to support a defense theory that the victim's allegations involving her sisters were not credible and, therefore, the victim's allegations against defendant were not credible. Thus, because defendant has not overcome the strong presumption of reasonable trial strategy, which this Court will not second-guess, defendant has failed to establish that defense counsel was ineffective. *Horn*, 279 Mich App at 39.

IV

Defendant next argues (1) that it was improper to admit testimony regarding whether the victim's brother, Ali, would feel guilty or feel as though he failed to protect his sisters if the allegations against defendant were true, and (2) that the evidence elicited by the prosecutor that sexual abuse could tarnish a woman's reputation in the victim's culture was irrelevant and constituted improper reputation evidence.[9] We disagree.

A

On appeal, defendant describes the prosecution's questioning of Ali with regard to how he would feel if the allegations against defendant were true as "guilt-assuming hypotheticals" that impermissibly attacked defendant's character and violated defendant's right to be presumed innocent. Contrary to this characterization, Ali did not testify regarding defendant's character or reputation in the community or his own character or reputation in the community. Instead, Ali testified regarding his own feelings about what he would and would not *want to be true* and whether he would personally feel guilty for not protecting his sisters from defendant's abuse. As such, defendant's reliance on authority regarding guilt-assuming hypotheses by character witnesses is inapposite because, here, Ali was a fact witness, and he was not testifying about defendant's reputation in the community.

---

[9] We reject defendant's argument that there was any claim at trial in violation of MRE 404 that the victim possessed a chaste or virtuous character. The prosecutor only argued that the victim was motivated by her family to keep the sexual abuse—which signified a lack of virtue in her culture—a secret.

If the prosecutor had established that believing the allegations against defendant would have made Ali feel guilty, the prosecutor could have argued that Ali was motivated to disbelieve those allegations and, thus, provided biased testimony on behalf of defendant. "A witness's bias is always relevant." *People v McGhee*, 268 Mich App 600, 637; 709 NW2d 595 (2005). However, Ali denied that he would feel any guilt and reiterated during the questioning that the allegations against defendant were untrue and that the prosecutor's questions were "hypothetical." Therefore, defendant has failed to establish that this line of questioning was prejudicial and affected his substantial rights. *Carines*, 460 Mich at 763. Likewise, defendant's claim of ineffective assistance on this basis must fail because an objection would have been futile, see *Unger*, 278 Mich App at 256, and defendant has failed to establish that he was prejudiced by this line of questioning, see *Gaines*, 306 Mich App at 300.

B

With regard to defendant's argument that the testimony regarding a woman's reputation in Lebanese-American culture was irrelevant, evidence is relevant under MRE 401 when it has a tendency to make a material fact that is of consequence to the action more or less probable. *People v Sabin*, 463 Mich 43, 56-57; 614 NW2d 888 (2000). Contrary to defendant's claim, "[m]ateriality . . . does not mean that the evidence must be directed at an element of a crime or an applicable defense. A material fact is one that is 'in issue' in the sense that it is within the range of litigated matters in controversy." *Id.* at 57 (citations and quotation marks omitted).

From the outset of the case, beginning with his opening statement, defense counsel attacked the victim's credibility by arguing that her delay in reporting the allegations indicated that the allegations were untrue. As such, any explanations for the delay were relevant to whether the victim was fabricating the allegations. The victim testified that, in her culture, if a man knows that a woman has been "touched before[,] . . . it's like you're trash . . . like you're not worthy to marry a good man." Additionally, the victim testified that when her family finally learned about the abuse, she was repeatedly warned to keep the information a secret in order to protect her reputation. The jury could infer that, as a result of this cultural belief, the victim did not reveal the abuse immediately, and even when she did reveal the abuse, the information was contained within the family for months for the same reason before Ahmad sought help from the police. Thus, the evidence regarding the perception of sexual abuse in the victim's culture was relevant, and its admission was not plain error. Moreover, defense counsel was not ineffective for failing to object because any objection would have been futile. *Unger*, 278 Mich App at 256.

V

Next, defendant argues that many of the trial court's rulings on the admission of evidence during defense counsel's cross-examination of the prosecution's witnesses and direct examination of the defense witnesses denied him the constitutional rights to present a defense and confront the witnesses against him. We disagree.

When an issue is preserved, we review a trial court's evidentiary ruling for an abuse of discretion. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). Preliminary questions of law underlying the trial court's ruling, such as whether a rule of evidence precludes admissibility, are reviewed de novo. *Id.* A preserved evidentiary error is presumed to be

harmless, and defendant bears the burden of proving otherwise. *People v Lukity*, 460 Mich 484, 493-495; 596 NW2d 607 (1999). This Court only reverses if, " 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *Id*. at 495-496, quoting MCL 769.26. The "examination of the entire cause" encompasses evaluating the error in the context of the untainted evidence. *Lukity*, 460 Mich at 495.

A defendant's constitutional right to present a defense and confront his accusers is secured by the right to cross-examination guaranteed by the Confrontation Clause. US Const, Am VI; Const 1963, art 1, § 20; *People v Adamski,* 198 Mich App 133, 138; 497 NW2d 546 (1993). However, the right to present a defense and cross-examine witnesses is not absolute. See *People v Hayes,* 421 Mich 271, 279; 364 NW2d 635 (1984); *People v Arenda,* 416 Mich 1, 8; 330 NW2d 814 (1982). "A witness may be cross-examined on any matter relevant to any issue in the case," MRE 611(c); see also *People v Layher*, 464 Mich 756, 764; 631 NW2d 281 (2001), but neither the Confrontation Clause nor due process confers an unlimited right to admit all relevant evidence or cross-examine on any subject, *Adamski,* 198 Mich App at 138. Rather, a court has wide latitude to impose reasonable limits on cross-examination based on concerns such as prejudice, confusion of the issues, or questioning that is only marginally relevant, among others. *Id.*; *People v Canter*, 197 Mich App 550, 564; 496 NW2d 336 (1992). Likewise, a defendant is not permitted to introduce irrelevant evidence, MRE 402, and a trial court may properly exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," MRE 403.

To the extent that defendant provides a specific basis for his claims of evidentiary error, the thrust of his argument is that the trial court erroneously precluded him from eliciting evidence demonstrating that the prosecution's witnesses had reasons or motivations to lie, which was relevant in response to the prosecution's theory of the case that her witnesses, particularly the victim and Ahmad, lacked a motive to lie about the allegations against defendant. For the following reasons, we find no basis for reversal.

Defendant challenges the preclusion of defense counsel's question to Mariam regarding whether she discussed her dissatisfaction with the victim's "choice of husband" and Laila's testimony that the victim's husband had a criminal record. The trial court ruled that the evidence regarding Mariam's dissatisfaction with the victim's husband was not relevant and struck Laila's statement regarding the victim's criminal history from the record. Defendant elicited evidence throughout trial in support of his theory that the family's disapproval of the victim's husband motivated her to fabricate the allegations of abuse. As such, any testimony from Mariam and Laila about the same subject would have been cumulative, and defendant does not argue how the family's specific reason for disliking the victim's husband—an alleged criminal record—was material to his case. Therefore, even if we assume, arguendo, that the trial court erroneously excluded this evidence, defendant cannot establish that it is more probable than not that the exclusion of this evidence was outcome-determinative, as defendant's theory of the case was adequately presented by other witnesses and arguments. *Lukity*, 460 Mich at 495.

Defendant also cites excluded questions regarding the family's disapproval of Zeina; the family's relationship with Ahmad and Zeina after their marriage; whether Zeina knew that the

victim's mother did not want Zeina to influence her daughters; and the extent of Zeina's contact with the women in the family. The prosecutor objected to these questions on several grounds, including relevance. Even if this evidence was relevant, *inter alia*, to demonstrate Ahmad's and Zeina's motivation to lie about defendant because they had a poor relationship with the family, it would have been cumulative. The record demonstrates that the same questions were asked of other witnesses, and defense counsel relied on their responses in his arguments to the jury regarding the defense's theory of the case. Thus, even if we assume, without deciding, that the trial court erred in excluding the testimony regarding these matters, defendant cannot establish that it is more probable than not that the exclusion of this evidence was outcome-determinative. *Lukity*, 460 Mich at 495.

Defendant cites questions by defense counsel regarding the interactions of the victim's mother with Ahmad's and Zeina's child and whether they accused her of hurting their son. But, again, the record already demonstrated that a conflict existed between Ahmad and Zeina and the rest of his family. Although the couple's belief that the mother abused their son may have demonstrated their bias against the mother, defendant fails to explain how this bias was material to any alleged bias against defendant; rather, defendant elicited testimony that Ahmad and defendant had been great friends, who often socialized together. As such, defendant once again cannot establish that it is more probable than not that the exclusion of this evidence was outcome-determinative. *Lukity*, 460 Mich at 495.

Defendant cites numerous other trial court rulings without any analysis regarding why the trial court abused its discretion in excluding the evidence. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Kevorkian,* 248 Mich App 373, 389; 639 NW2d 291 (2001) (quotation marks and citation omitted). Accordingly, we conclude that these additional claims of evidentiary error are abandoned.

VI

Defendant argues that the victim's diary entries were inadmissible hearsay, that the elicitation of this evidence amounted to prosecutorial misconduct, and that defense counsel provided ineffective assistance by failing to object to the diary entries. We disagree.

MRE 801(c) defines hearsay as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." MRE 801(a). Hearsay is not admissible, except as specifically provided by the rules of evidence. MRE 802.

With regard to prior consistent statements, MRE 801(d) provides, in relevant part:

> (d) Statements which are not hearsay. A statement is not hearsay if–

> (1) Prior statement of witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with the declarant's testimony and is offered to

rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . .

In *People v Jones*, 240 Mich App 704, 706-707; 613 NW2d 411 (2000), this Court, quoting *United States v Bao*, 189 F3d 860, 864 (CA 9, 1999), held that the party offering a prior consistent statement must establish four elements:

> (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose. [Quotation marks omitted.]

First, defendant contests the second element of the inquiry, arguing that defense counsel's challenges to the victim's credibility in his opening statement were insufficient to constitute express or implied charges of fabrication because he had not yet cross-examined the victim and his opening statement was in response to the prosecution's opening statement. This Court rejected this same argument in *Jones*, holding that the second element was satisfied by defense counsel's comments during her opening statement that the witness's testimony resulted from improper influence or motive. *Jones*, 240 Mich App at 707-708. Although defendant asserts that *Jones* was wrongly decided, we are bound by that decision. See MCR 7.215(J)(1). Therefore, we reject defendant's claim given the express and implied charges in defense counsel's opening statement that the victim's allegations against defendant were fabricated.

Second, defendant contests the fourth element, asserting that the victim did not compose the diary entries before the time that the supposed motive to falsify arose. We agree that, by the time the victim wrote the diary entries in 2012, the alleged motive to falsify—retribution for her family's disapproval of her husband—had already arisen. However, even if the diary entries were therefore hearsay, such that the admission of the diary entries constituted plain error, defendant cannot establish that the evidence affected his substantial rights. The victim's testimony regarding the specific instances of sexual abuse by defendant, standing alone, was sufficient to support defendant's convictions. See MCL 750.520h; *People v Hallak*, ___ Mich App ___, ___; ___ NW2d ___ (2015) (Docket No. 317863); slip op at 4. The victim testified that she only made general allegations of abuse and explained how she felt afterward in her diary. The record demonstrated that the victim made similar, general allegations to her sisters, to her friend, to her family at a meeting, and to her husband. Defendant does not argue on appeal that this evidence also should have been excluded. In light of this cumulative evidence in the record, we conclude that any error in the admission of the diary entries did not affect defendant's substantial rights because defendant has not shown that the admission of the evidence affected the outcome of the proceedings. *Carines*, 460 Mich at 763.

We further reject defendant's claim of prosecutorial misconduct because he does not argue that this evidence was presented in bad faith, see *People v Dobek*, 274 Mich App 58, 70; 732 NW2d 546 (2007) ("A prosecutor's good-faith effort to admit evidence does not constitute misconduct."), and a cautionary instruction could have cured any prejudice, *People v Ackerman*, 257 Mich App 434, 449; 669 NW2d 818 (2003). Additionally, we reject defendant's claim of

ineffective assistance.[10] We will not second-guess defense counsel's strategy, which included not objecting to the diary entries and using evidence from the same entries to attack the victim's credibility—including that the victim wrote that defendant only "tried to do things" to her and left her alone when she asked—and support the defense theory that the victim blamed defendant as retribution for the discord in her family related to her marriage. *LeBlanc,* 465 Mich at 578; *Horn,* 279 Mich App at 39. Likewise, there is no indication that defendant was prejudiced by defense counsel's failure to object to the statements in the diary for the reasons stated above.

VII

Defendant argues that testimony regarding the contents of the recorded conversation between the victim and her mother constituted inadmissible hearsay. We disagree.

As stated above, MRE 801(c) defines hearsay as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The victim testified that she recorded a conversation between herself and her mother about defendant's abuse of her so that her mother could not later accuse her of lying about the incidents. The prosecutor elicited testimony that, in the recording, the victim mentioned whom she previously told about the abuse. The victim and Ahmad also testified that, in the recording, their mother angrily expressed concerns about "how this would look if people found out in the community" and encouraged the victim to lie about it. Contrary to defendant's claim on appeal, we find that the contents of the recording were not offered to prove the truth of the statements it contained (i.e., that defendant abused the victim or that the victim's reputation in the community was actually at risk). Although the prosecutor did not have an opportunity to explain the reason why the evidence was offered because defendant failed to object to the testimony, the statements made by the parties during their opening statements and closing arguments and the context of the prosecutor's elicitation of the evidence indicates that the testimony was offered to explain why the victim maintained her secrecy and did not go to the police.[11] "An out-of-court statement introduced to show its effect on a listener, as opposed to

---

[10] Defendant argues for the first time in his reply brief that defense counsel was ineffective when he failed to object to the diary entries because defense counsel never asserted in his opening statement that the victim's allegations were *recently* fabricated. Defendant did not raise this argument in his brief on appeal, and this argument is not responsive to the prosecution's brief. Therefore, we decline to address it. See MCR 7.212(G) ("Reply briefs must be confined to rebuttal of the arguments in the appellee's or cross-appellee's brief and must be limited to 10 pages, exclusive of tables, indexes, and appendices, and must include a table of contents and an index of authorities."). However, we note that the remarks in defense counsel's opening statement also implied that the victim had a *motive to falsify* based on her family's, and defendant's, disapproval of her husband. *Jones*, 240 Mich App at 706-707 ("[T]here must be an express or implied charge of recent fabrication *or* improper influence or motive of the declarant's testimony . . . ." [Emphasis added.]).

[11] In making this conclusion, we find significant the fact that the victim's testimony regarding the statements in the recording did not include a description of defendant's abuse. Although she

-13-

proving the truth of the matter asserted, does not constitute hearsay under MRE 801(c)." *Gaines*, 306 Mich App at 306-307. Therefore, it was not plain error to admit evidence of these statements from the recording.

Likewise, to the extent that Ahmad described the subject matter of the recording during his testimony, our review of the record indicates the testimony regarding the contents of the tape was not offered to prove the truth of the statements, but to show the effect they had on the victim's reporting of the incident. See *Gaines*, 306 Mich App at 306-307. Furthermore, the context of the prosecutor's examination of Ahmad indicates that the statement was also intended to show the recording's effect on Ahmad, which resulted in him speaking with his mother and contacting his brothers and uncles, who initiated a family meeting. *Id*. Therefore, we conclude that it was not plain error to admit the victim's and Ahmad's testimony regarding the statements in the recording.

Defendant also challenges the prosecutor's elicitation of testimony from Zeina about the recording. However, Zeina merely testified that she heard the recording, that she did not have a copy of the recording until shortly before trial, and that she did not recall sharing the recording with the police. None of this evidence involved out-of-court statements. MRE 801. Therefore, we reject defendant's claim that Zeina's testimony constituted inadmissible hearsay.

Additionally, defendant challenges testimony from the victim's mother, Ali,[12] and Latefa on cross-examination by the prosecutor, which indicated that the victim said in the recording that defendant only abused "somebody else" or "other people."[13] Because it was the prosecutor's burden to prove that defendant abused *the victim*, we conclude that it was not her intent with this testimony to show that defendant only abused others. Therefore, the statements were not offered for their truth and, therefore, did not constitute inadmissible hearsay. MRE 801(c). Rather, this testimony demonstrated that defendant's witnesses testified in a way to further conceal a family secret and further explained why the victim would have delayed reporting.

Moreover, we reject defendant's claim of prosecutorial misconduct because he has failed to establish that the prosecutor offered the recording in bad faith, *Dobek*, 274 Mich App at 70, and, to the extent that defendant argues that defense counsel was ineffective by failing to object

---

testified that the topic of the conversation was "what [defendant] did to me," the rest of her testimony concerned why she recorded the conversation, how her mother reacted to the news, and other topics that they discussed during the conversation (e.g., how the situation would appear if other individuals in the community were aware of it and to whom the victim had disclosed her allegations).

[12] The portion of the transcript cited by defendant only indicates that Ali confirmed that he had heard the recording; Ali stated that he could not remember what was said.

[13] Defendant claims the introduction of statements in the recording about "other people" or "somebody else" was more prejudicial than probative under MRE 403. But as discussed earlier, defendant's strategy was to claim that the victim lied about defendant's abuse of others and, therefore, similarly lied when she claimed that defendant abused her. Because the challenged evidence also supported defendant's strategy, we reject defendant's claim.

to evidence of the recording, any objection would have been futile because it was not inadmissible hearsay for the reasons stated above. *Unger*, 278 Mich App at 256.

Finally, we find no basis for reversal based on defendant's claim that the jury impermissibly used the statements regarding the recording and the sisters' out-of-court statements at the family meeting as substantive evidence of his guilt. The trial court instructed the jury that it may only consider prior inconsistent statements in order to determine whether the witness testified truthfully in court, specifically stating that "[t]he earlier statement is not evidence that what the witness said earlier is true." "Juries are presumed to follow their instructions," *People v Rodgers*, 248 Mich App 702, 717; 645 NW2d 294 (2001), and defendant has failed to rebut that presumption.

VIII

Lastly, defendant asserts that the prosecution improperly bolstered the credibility of the out-of-court statements made by the victim's sisters at the family meeting by eliciting testimony that the victim's sisters changed their stories after a suggestion was made that they take a polygraph examination regarding whether they were abused. We disagree.

"Normally, reference to a polygraph test is not admissible before a jury. Indeed, it is a bright-line rule that reference to taking or passing a polygraph test is error." *People v Nash*, 244 Mich App 93, 97; 625 NW2d 87 (2000) (citations omitted). But the mere mention of the word "polygraph" does not necessarily require reversal. *Id.* at 98, citing *People v Rocha*, 110 Mich App 1, 8-9; 312 NW2d 657 (1981); *People v Kosters,* 175 Mich App 748, 754; 438 NW2d 651 (1989).

> [R]eference to polygraph examinations need not always constitute reversible error. A reference may be a matter of defense strategy, the result of a nonresponse answer, or otherwise brief, inadvertent and isolated. [T]his Court has analyzed a number of factors to determine whether reversal is mandated . . . (1) whether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test were admitted rather than merely the fact that a test had been conducted. [*Rocha*, 110 Mich App at 8-9 (citations omitted); see also *Nash*, 244 Mich App at 98.]

Here, the references were not inadvertent or isolated. The prosecutor specifically elicited testimony from several prosecution witnesses about whether anyone at a family meeting suggested the use of a polygraph examination when the sisters denied any abuse. And the reference to the polygraph examination could have added to the credibility of the prosecution's witnesses, who claimed that the sisters finally admitted that defendant abused them after the polygraph was suggested. But there was no evidence that a polygraph was actually given. Thus, no results were considered by the jury. In addition, defendant did not object to the evidence or request a cautionary instruction. Rather, defendant used the evidence to support his defense theory. The defense witnesses testified that the sisters' claims that they were never abused remained consistent throughout the family meeting—even in the face of what they described as

violent threats by Ahmad and the suggestion that they take a polygraph. The jury could infer from this testimony that the sisters were truthful and that they would not have otherwise undergone such pressure to protect a lie.

Because the defense relied on the polygraph references to support its argument that its witnesses were credible, defendant cannot establish that this evidence affected his substantial rights, i.e., that it was outcome-determinative. *Carines*, 460 Mich at 763. To the extent that defendant claims that the prosecutor's elicitation of the challenged testimony amounted to misconduct, again, "[a] prosecutor's good-faith effort to admit evidence does not constitute misconduct," *Dobek*, 274 Mich App at 70, and there is no indication that the prosecution elicited the testimony in bad faith or that the prosecutor suggested that she had special knowledge of the witnesses' credibility based on the references to a polygraph, see *People v Bennett*, 290 Mich App 465, 477; 802 NW2d 627 (2010). Moreover, in light of defense counsel's clear strategy to use the suggestion to take a polygraph examination as additional evidence that the sisters, who testified on defendant's behalf, were unwavering, defendant has failed to overcome the strong presumption that defense counsel's failure to object to the challenged evidence was a reasonable trial strategy. *Horn*, 279 Mich App at 39; *Unger*, 278 Mich App at 242. Likewise, for the reasons stated above, there is no indication that the outcome of the trial would have been different but for defense counsel's failure to object to the challenged evidence. *Gaines*, 306 Mich App at 300.

Affirmed.


/s/ Kurtis T. Wilder
/s/ Amy Ronayne Krause